William J. Edelman (SBN 285177)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
wedelman@milberg.com

*Attorneys for Plaintiffs and Proposed Class*
*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Devin Youngblood, Nicole Chmura, and Chris Rice on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.: 3:26-cv-1100<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF DMCA, 17 U.S.C. § 1201(a)**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs, Devin Youngblood, Nicole Chmura, and Chris Rice ("Plaintiffs") bring this class action complaint ("Complaint") on behalf of themselves and all others similarly situated (the "Class Members") against Meta Platforms, Inc., ("Meta" or "Defendant") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

**NATURE OF THE ACTION**

1. This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Meta's unauthorized acquisition—through scraping, bulk downloading, and other extraction methods—of various content creators' YouTube-hosted audiovisual works ("Works") at the file level by bypassing YouTube's technological measures that control access to those Works and Meta's use of those unlawfully accessed Works to train, develop, and improve Meta's "world model" artificial intelligence systems.

2. YouTube makes creators' videos available to the public primarily through controlled streaming pathways and related authorized features. YouTube also employs technical measures designed to control access to the underlying audiovisual files and to prevent bulk extraction by automated systems.

3. YouTube's technical controls are designed to provide access through user-based streaming and to prevent non-authorized bulk extraction. At the scale required for modern AI video-model training, like those created by Meta, obtaining file-level copies of the Works necessarily requires bypassing those controls.

4. Meta did not obtain licenses or permissions from Plaintiffs and Class members for the file-level acquisition and use of their Works as training inputs for its AI models. Instead, on information and belief, Meta used or relied on circumvention tools and services to defeat YouTube's technological measures at scale.

5. The DMCA prohibits circumventing a technological measure that effectively controls access to a copyrighted work, and it prohibits trafficking in circumvention technologies and services. 17

2
**CLASS ACTION COMPLAINT**

U.S.C. § 1201(a). Plaintiffs seek injunctive relief, statutory damages, and other remedies authorized by 17 U.S.C. § 1203.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Meta. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, et seq. (the Digital Millenium Copyrights Act ("DMCA")).

7. This Court has personal jurisdiction over Defendant because Meta is headquartered in California, transacts business nationwide, and committed the acts complained of in this District and/or directed them at this District, causing harm here.

8. Venue is proper in this District because Meta resides in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

9. Plaintiffs reserve the right to refine jurisdiction and venue allegations after discovery and as additional facts become available.

**THE PARTIES**

10. Plaintiff, Devin Youngblood, is a resident of Alabama who owns and operates the YouTube channel "The Youngblood's Podcast." The Youngbloods Podcast is a YouTube channel and podcast operated by Devin Youngblood and his wife. Through the channel, Plaintiff Youngblood publishes weekly audio and video episodes in which they respond to listener-submitted questions and discuss topics including marriage, parenting, family relationships, mental health, and personal experiences drawn from their own lives. The content is presented as candid, unscripted commentary based on the hosts' personal perspectives and family experiences and is distributed to the public via YouTube.

11. At least one video from "The Youngblood's Podcast" appears in the dataset HowToI00M, which Defendant used to train its AI video-learning architecture.

12. Plaintiff, Nicole Chmura, is a resident of California and the owner and operator of the YouTube channel "Let's Go Team." The channel features videos documenting Plaintiff Chmura's own

3
**CLASS ACTION COMPLAINT**

personal travel experiences, which she independently records and publishes. Through the channel, Plaintiff Chmura provides firsthand observations and candid opinions based on trips she personally undertakes and pays for. Plaintiff Chmura does not accept free or discounted travel, lodging, or services from cruise lines, airlines, hotels, or other travel-related entities, and the content on the channel reflects her independent, unsponsored viewpoints.

13. At least one video from the "Let's Go Team" YouTube channel appears in the dataset HowTo100M, which Defendant used to train its AI video-learning architecture.

14. Plaintiff, Chris Rice, is a resident of Massachusetts who owns and operates a YouTube channel. Plaintiff Rice's YouTube channel presents a first-person documentarian view covering a wide range of topics. The channel features experiential, explanatory, and observational videos in which the Plaintiff Rice documents real-world activities, shares personal experiences, and presents information in an accessible and engaging manner.

15. At least one video from the Plaintiff Chris Rice's YouTube channel appears in the dataset HowTo100M, which Defendant used to train its AI video-learning architecture.

16. Plaintiffs and Class members derive value from their Works through viewership, advertising, sponsorships, licensing, and other monetization that depends on controlled distribution and the ability to choose whether, when, and how their Works will be licensed for downstream uses, including AI model training.

17. Plaintiffs and the Class Members are independent content creators of audiovisual content hosted on YouTube.

18. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located at 1 Meta Way, Menlo Park, California 94025.

19. Meta develops and commercializes artificial intelligence models and related products and services, including video understanding and "world model" systems that rely on large-scale video training data.

## FACTUAL ALLEGATIONS

**A. YouTube's Access-Controlled Distribution of Creator Works**

4

**CLASS ACTION COMPLAINT**

20. YouTube is a video-sharing platform on which creators upload original audiovisual works. Those works are protected by copyright, and creators retain rights and control over licensing and other downstream uses.

21. YouTube provides access to videos primarily through controlled streaming. YouTube's design is intended to enable real-time viewing and limited download features available to those users who have purchased a "Premium" license from YouTube.

22. YouTube employs technological protective measures ("TPMs") to limit file-level acquisition and bulk extraction of underlying audiovisual files.

23. YouTube's Terms of Service expressly bar scraping, unauthorized downloading, bulk extraction, and other forms of data mining of audiovisual content except through expressly permitted product features or licensed APIs. Those contractual limits operate in tandem with YouTube's TPMs to prevent unlicensed, file-level access to creators' videos and to ensure that content is accessed only through YouTube's controlled platform.

24. Indeed, YouTube has publicly stated that if AI companies are scraping videos hosted on its website for use in AI training models, it would be considered a "clear violation" of YouTube terms of service.[1]

25. Content creators (including Plaintiffs) who upload videos to YouTube grant YouTube and other users limited permissions to access that content through YouTube's services. But the license language makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service." In other words, end users are permitted to view or stream videos within YouTube's environment, not to obtain or use the underlying audiovisual files outside the Service. YouTube's Terms of Service thus reflect YouTube's intent to restrict access to the digital files underlying the videos that users are allowed to stream.

---

[1] Paolo Confino, OpenAI Could Be in a "Clear Violation" of YouTube's Terms of Service, CEO Says—Depending on How It Trains Its Sora Video Tool, *Fortune* (Apr. 4, 2024), available at: https://fortune.com/2024/04/04/openai-youtube-clear-violation-terms-service-ai-sora-training/ (last visited Jan. 22, 2026).

5
**CLASS ACTION COMPLAINT**

26. Streaming a video through YouTube and downloading a permanent copy offer materially different value propositions—free viewing supported by advertisements versus possession of a lasting digital copy. Scraping or bulk downloading is therefore not simply copying material that YouTube provides to the public; it is an act of unauthorized access to audiovisual data files that YouTube affirmatively withholds from public download.

27. Although YouTube offers certain download functionality to paying subscribers (e.g., YouTube "Premium"), YouTube's TPMs restrict that functionality in ways that prevent users from obtaining the underlying audiovisual files. YouTube prohibits downloading audiovisual content except through the YouTube application, and any "download" makes content available only for offline streaming within the app—not as a transferable, permanent file copy. The offline access is also time-limited, after which the content reverts to online streaming only.

28. To enforce these prohibitions, YouTube uses technological processes to identify and prevent unauthorized extraction. For instance, YouTube periodically updates APIs in ways that disrupt non-authorized downloaders relying on outdated interfaces to extract files. YouTube also monitors downloading behavior and may throttle, restrict, or block IP addresses associated with excessive download attempts over a specified period.

29. YouTube's TPMs are actively maintained and updated to prevent automated download tools from reliably reconstructing full video files outside YouTube's player-based environment.

30. In addition, YouTube maintains a framework based on express permission that allows creators to decide whether third-party AI companies may use their YouTube videos for AI model training.

31. Under YouTube's policy and settings, creators may permit third-party training only by turning on a "third-party training" setting and selecting which third-party companies, if any, are allowed.

32. By default, YouTube's third-party training setting is turned off—meaning creators do not need to take any action to withhold permission, and third-party training is not authorized unless the creator affirmatively opts in.

33. Even when a creator chooses to opt in, YouTube requires the creator to make an affirmative choice: either (a) select one or more companies from YouTube's list of participating third-party AI companies, or (b) choose an "All third-party companies" option that grants permission broadly.

34. In other words, YouTube does not treat creators as having granted permission to any third-party AI company unless and until the creator affirmatively authorizes such use.

35. YouTube's list of third-party companies presented to creators includes major AI developers, including Meta—reflecting that YouTube contemplated that third-party AI developers would require explicit creator permission before using YouTube videos for training.

36. Plaintiffs and Class members, who are YouTube content creators, post their original works to YouTube and rely on YouTube's controlled-access architecture to protect the value of their Works and to preserve licensing markets, including the emerging market for AI training licenses.

37. Most YouTube videos are not registered with the U.S. Copyright Office. But that does not make them free to take or use. Creators still pour real time, skill, and money into producing their videos, and they depend on YouTube's technological safeguards to keep the underlying files from being accessed and downloaded without permission. And because a DMCA circumvention claim does not hinge on copyright registration, these protections matter most in exactly this situation—where Defendant's misconduct is breaking through access barriers that are designed to prevent anyone from obtaining the underlying video files.

**B. Meta's Video-Learning AI Architecture**

38. Meta obtained file-level access to large volumes of YouTube-hosted videos for use in its video-model training pipelines namely Meta's video-learning architecture known as the Video Joint Embedding Predictive Architecture (V-JEPA and V-JEPA 2) models.

39. In February 2024, Meta introduced V-JEPA, a non-generative video model that learns by predicting missing or masked portions of video in an abstract "representation space," rather than by recreating or generating the underlying pixels of the video itself.

40. In this respect, V-JEPA is analogous to Meta's Image Joint Embedding Predictive Architecture ("I-JEPA"), which similarly learns by comparing abstract representations of images rather than comparing images at the pixel level.

41. Unlike generative approaches that attempt to reconstruct every missing pixel, V-JEPA is designed to discard information that is unpredictable, enabling the model to focus on features that are more stable and useful for downstream tasks.

42. V-JEPA is designed to focus on predictable structure in video (e.g., objects, motion, and interactions) while discarding or de-emphasizing unpredictable details, improving efficiency and performance.

43. V-JEPA uses a self-supervised learning approach in which large portions of video are masked so that the model receives only limited context and must predict what is missing in the representation space.

44. Under this self-supervised learning approach, the model is pre-trained on unlabeled video data without requiring human-supplied category labels during the pre-training phase.

45. Because V-JEPA is trained from raw video inputs and learns from masked-video prediction, its performance depends heavily on access to large-scale, diverse video files suitable for repeated ingestion, decoding, masking, and training. Meta's training of V-JEPA is designed to absorb and process enormous quantities of real-world video.

46. In its published V-JEPA research, Meta described building an "unsupervised video pretraining dataset" (referred to as "VideoMix2M") by combining multiple public video datasets, including HowTo100M (YouTube tutorial videos), Kinetics, and Something-Something-v2, yielding approximately two million videos.

47. On June 11, 2025, Meta published V-JEPA 2 and associated materials describing a scaled, self-supervised video model intended to support "understanding, prediction and planning" in the physical world.

48. Meta's V-JEPA 2 publication describes pretraining on "internet-scale" video and image data, including "over 1 million hours of internet video," in order to learn generalizable representations of the physical world from observation.

49. Meta has publicly tied V-JEPA 2 to downstream "planning" capabilities, including robotic and physical-interaction tasks that require models to predict how the world changes over time and to choose actions accordingly.

50. Meta has publicly described the sources of its V-JEPA 2 "observation pretraining dataset" identifying the following four video sources and one image dataset used during pretraining: (i) Something-Something-v2 (5.6%), (ii) Kinetics (18.8%), (iii) HowTo100M (31.8%), and (iv) YT-Temporal-1B (18.8%), alongside ImageNet images (25.0%).

51. Meta's publication further describes HowTo100M as "YouTube tutorial videos" and YT-Temporal-1B as "general YouTube videos," reflecting that these sources are primarily composed of YouTube-hosted works.

52. Based on Meta's own disclosed weights, YouTube videos (HowTo100M plus YT-Temporal-1B) account for over 50% of the V-JEPA 2 pretraining sampling mixture.

53. Meta's prior V-JEPA work likewise relied on a dataset mixture that included HowTo100M—again reflecting Meta's reliance on YouTube-sourced material for large-scale video pretraining of its AI models.

54. Many widely used public video datasets derived from YouTube, including the YouTube-derived datasets identified by Meta, do not contain the underlying video files. Instead, the datasets provide lists of pointers (such as URLs and YouTube IDs) and metadata.

55. For example, the public dataset materials for YT-Temporal-1B emphasize that the publicly released artifacts are "video IDs and information," and provide storage locations for "video IDs" files.

56. Similarly, public HowTo100M dataset is organized around fields such as "video_id," reflecting that the dataset is keyed to YouTube video identifiers and associated annotations (e.g., captions/time segments).

9
**CLASS ACTION COMPLAINT**

57. Because these datasets are identifier- and metadata-driven, any downstream user seeking to use the videos for AI model training must retrieve and reproduce the referenced YouTube videos at scale.

58. In other words, HowTo100M and YT-Temporal-1B are index-only datasets, that cannot be used for AI video-model training without separately retrieving the underlying videos from YouTube and converting them into local files or decoded clips suitable for repeated preprocessing and training.

59. Accordingly, on information and belief, Meta could not have trained V-JEPA and V-JEPA 2 with HowTo100M and YT-Temporal-1B without engaging in large-scale, automated downloading/copying of the referenced YouTube videos which Plaintiffs allege was done via methods that required circumvention of YouTube TPMs thus violating DMCA.

**C. Meta's Acquisition of YouTube Videos Required Bypassing YouTube's Technological Access Controls**

60. Because YouTube's TPMs restrict file-level bulk extraction, Meta could only obtain YouTube videos at the necessary scale by defeating or bypassing those measures, including by using circumvention tooling that obtains video files outside YouTube's authorized access pathways.

61. On information and belief, Meta's systems incorporated evasion mechanisms and anti-detection measures designed to circumvent YouTube's TPMs.

62. Defendant—acting directly and through its agents, contractors, and affiliates—intentionally accessed large volumes of YouTube videos using scraping and/or other tools and workflows designed to bypass or evade YouTube's technical protection measures and usage restrictions.

63. As used here, "scraping" refers to the automated downloading of audio and video files from a website—here, YouTube—through scripted or other non-manual processes.

64. Defendant built datasets by independently scraping content from YouTube without the knowledge or consent of either YouTube or the creators whose works were taken.

65. Defendant's scraping required the use of methods designed to bypass YouTube's technical safeguards that restrict unauthorized access to the underlying digital audiovisual files.

66. These methods are not part of ordinary, consumer-facing use of YouTube; rather, they are specialized steps used to obtain the files themselves outside of YouTube's intended streaming environment.

67. On information and belief, Defendant employed tools and techniques including the open-source YouTube downloader "yt-dlp," together with virtual machines or comparable infrastructure used to rotate and refresh IP addresses while pulling content from YouTube.

68. IP rotation through virtual machines (or similar systems) is necessary because YouTube monitors downloading behavior associated with particular IP addresses and restricts or blocks IP addresses exhibiting automated or high-volume download activity.

69. The yt-dlp tool is designed to download audio and video content from online platforms including YouTube. It can, among other things, automatically retrieve audio and video streams, merge them into a single file, and download multiple videos or full playlists. On information and belief, Defendant used yt-dlp to download content at scale, merging separate audio and video streams, and retrieving playlists or other bulk collections of underlying files.

70. Meta's circumvention was willful. Meta is a sophisticated technology company familiar with platform access controls and anti-scraping protections, and Meta knowingly chose circumvention-based acquisition rather than licensing creators' works through authorized channels.

71. On information and belief, Meta's mass acquisition of YouTube videos for AI training involved "circumvent[ing] a technological measure that effectively controls access" to copyrighted audiovisual works, within the meaning of 17 U.S.C. § 1201(a).

72. On information and belief, Meta further "avoid[ed], bypass[ed], remove[d], deactivate[d], or impair[ed]" technological measures designed to restrict unauthorized retrieval and copying of YouTube content, including at a scale far beyond ordinary consumer viewing.

73. Meta's conduct was not an incidental or accidental access event; rather, it was undertaken deliberately and systematically to acquire an enormous volume of copyrighted audiovisual works for use in training commercial AI systems.

**D. Meta's Commercial Motive**

11
**CLASS ACTION COMPLAINT**

74. Meta's V-JEPA line of research is not academic in isolation; it aligns with Meta's commercial strategy to deploy AI systems that perceive and act in the physical world ("physical AI"), including through consumer hardware.

75. Meta has pursued "AI glasses" as a consumer platform, including the Ray-Ban Meta smart glasses product line introduced in October 2023.

76. In February 2025, EssilorLuxottica—the manufacturer of Meta's Ray-Ban smart glasses—publicly stated that approximately two million pairs of Meta Ray-Ban glasses had been sold since their October 2023 debut, and that the companies were expanding capacity with an ambition of reaching 10 million annual units by the end of 2026.

77. Meta's push intensified in 2025 with the announcement of a flagship display-equipped model called "Meta Ray-Ban Display," marketed as AI glasses that integrate a built-in display and a wrist-worn control device ("Meta Neural Band").

78. Meta publicly represented that Meta Ray-Ban Display would be priced starting at approximately $799 and would reach U.S. retail shelves on or about September 30, 2025, including at retailers such as Best Buy, LensCrafters, Sunglass Hut, and Ray-Ban stores.

79. Market reporting further reflected that demand for Meta's AI-enabled glasses materially contributed to EssilorLuxottica's sales growth and prompted accelerated production plans—demonstrating the substantial commercial stakes associated with Meta's wearable "physical AI" strategy.

80. Meta's commercial ambitions for AI wearables and "physical AI" increase the incentive to develop and train powerful world-modeling systems like V-JEPA and V-JEPA 2—systems that require enormous quantities of real-world video to learn predictive representations of people, objects, motion, and environments.

81. On information and belief, Meta's reliance on large-scale YouTube harvesting for V-JEPA and V-JEPA 2 was undertaken to accelerate the development and competitive positioning of Meta's AI systems and AI-enabled consumer hardware.

E. **Defendant's Actions Caused Harm to Plaintiffs and Class Members**

82. Creators like Plaintiffs and the Class Members cannot meaningfully "undo" what Defendant has done. Once an AI system ingests a work during training, as is the case here, the value of that work is extracted and embedded into the model in ways that cannot be reliably removed or recalled.

83. Defendant never sought or obtained authorization from Plaintiffs or Class Members to access or use the videos Defendant took for AI training.

84. Defendant never sought authorization and never paid Plaintiffs or Class Members for the access, copying, ingestion, and use of their YouTube videos within AI training pipelines and related workflows.

85. Plaintiffs and Class Members selected YouTube as a primary platform for publishing their works in substantial part because YouTube's terms and protections prohibit the very scraping, unauthorized access, bulk downloading, and data-mining conduct Defendant used to obtain Plaintiffs' and Class Members' video content.

## CLASS ACTION ALLEGATIONS

86. **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as follows:

> All persons and entities in the United States who are creators and/or rights-holders of YouTube-hosted videos that Meta accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube through circumvention of YouTube's TPMs (the "Class").

87. Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

88. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

89. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

90. <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party YouTube's records.

91. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs' Works were included in the datasets used by Meta in the training of Meta's AI models. Meta unlawfully accessed and downloaded the Works through the use of technological measures aimed at circumventing YouTube's TPMs. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

92. <u>Adequacy</u>. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests coincide with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

93. <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether YouTube employs "technological measures that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a).

(b) Whether Meta accessed YouTube-hosted videos at the file level to obtain training-ready copies, clips, frames, or other stored representations of Class members' Works.

(c) Whether Meta retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in HowTo100M or YT-Temporal-1B and any other datasets used by Meta at massive scale to build training material for V-JEPA and V-JEPA 2 and related systems.

(d) Whether Meta's methods for retrieving YouTube videos defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs.

(e) Whether Meta thereby violated 17 U.S.C. § 1201(a)(1) by circumventing technological measures controlling access to Class members' Works.

(f) Whether Meta's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain.

(g) Whether Meta's conduct caused Class wide injury by depriving creators and rights-holders of control over access to and use of their Works and by enabling Meta's ongoing possession and use of unlawfully accessed copies within its training pipelines.

(h) Whether Plaintiffs and Class members are entitled to declaratory and injunctive relief requiring Meta to cease circumvention-based access to YouTube-hosted Works and to implement compliance measures sufficient to prevent further circumvention.

(i) Whether Plaintiffs and Class members are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Meta's violations of 17 U.S.C. § 1201.

94. <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIM FOR RELIEF**

**FIRST CAUSE OF ACTION
VIOLATION OF 17 U.S.C. § 1201(a)
(DMCA ANTI-CIRCUMVENTION)**

15
**CLASS ACTION COMPLAINT**

95. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

96. YouTube prohibits scraping, unauthorized downloading, bulk extraction, and other forms of automated retrieval of audiovisual content through access controls to prevent unlicensed, file-level access to the underlying video files.

97. Plaintiffs and Class members uploaded and distributed their original Works on YouTube in substantial part because YouTube protects against third parties engaging in bulk downloading or automated extraction of creators' videos outside YouTube's controlled streaming and download pathways.

98. Content creators, including Plaintiffs and Class members, reasonably expect that their Works will be accessed only through YouTube's authorized viewing and distribution mechanisms, and will not be accessed at the file level, scraped, downloaded, and copied at massive scale without consent.

99. YouTube's TPMs constitute "effective technological measures" within the meaning of 17 U.S.C. § 1201 because those measures, in the ordinary course of operation, control access to copyrighted audiovisual works and prevent third parties from obtaining file-level copies at scale without defeating those controls.

100. On information and belief, Meta used and/or relied on automated tools, services, and methods designed for the purpose of bypassing and circumventing YouTube's TPMs in order to retrieve, extract, and reconstruct underlying video files that YouTube does not make available for bulk download to the public, and, through that circumvention-based harvesting, Meta improperly obtained millions of YouTube videos.

101. On information and belief, Meta accessed, downloaded, stored, and processed unlawfully obtained YouTube videos (and/or training-ready derivatives such as decoded clips, frames, embeddings, or other representations) to assemble and maintain training materials used to develop, train, and improve Meta's video "world model" systems, including Meta's V-JEPA and V-JEPA 2 models and related services.

102. Meta's violations were willful because, among other reasons, Meta is a sophisticated technology company that understood YouTube's TPMs, yet knowingly used or relied on automated

circumvention methods designed to evade YouTube's anti-scraping protections in order to obtain training data at massive scale.

103. Each act of circumvention constitutes a separate violation of 17 U.S.C. § 1201. Plaintiffs and Class members are therefore entitled to statutory damages, injunctive relief, and attorneys' fees and costs pursuant to 17 U.S.C. § 1203.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

(b) Declare that Meta violated 17 U.S.C. § 1201(a) by circumventing YouTube's TPMs controlling access to Plaintiffs' and Class members' Works;

(c) Enter injunctive relief requiring Meta to cease circumvention-based access to YouTube-hosted Works and to implement compliance measures sufficient to prevent further circumvention;

(d) Award statutory damages and/or other damages as authorized by 17 U.S.C. § 1203;

(e) Award Plaintiffs and the Class their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(5); and

(f) Award such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury for all the claims asserted in this Complaint so triable.

Date: February 4, 2026               Respectfully submitted,

                                     /s/ William J. Edelman
                                     William J. Edelman (SBN 285177)
                                     **MILBERG, PLLC**
                                     227 W. Monroe Street, Suite 2100
                                     Chicago, IL 60606
                                     Tel: 866.252.0878

wedelman@milberg.com

Michael A. Acciavatti (*pro hac vice* forthcoming)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: 212.594.5300
macciavatti@milberg.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: (925) 284-1520
ostrow@kolawyers.com

James E. Cecchi (*pro hac vice* forthcoming)
Kevin G. Cooper (*pro hac vice* forthcoming)
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Rd.
Roseland, NJ 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Counsel for Plaintiffs and the Putative Class*

**CLASS ACTION COMPLAINT**